# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

MISTRELL ALVIN,                    )
                                   )
  Petitioner,              )
                                   )
v.                                 )    Case No. CV611-065
                                   )          CR606-026
UNITED STATES OF AMERICA,          )
                                   )
  Respondent.              )

## REPORT AND RECOMMENDATION

Convicted of violating 21 U.S.C. § 846, CR606-026, doc. 720,[1] *aff'd*, *United States v. Bacon*, 598 F.3d 772 (11th Cir. 2010), Mistell Alvin moves for 28 U.S.C. § 2255 relief. CR606-026, docs. 1212 & 1214. He also moves to amend his § 2255 motion, docs. 1226 & 1233, for discovery, doc. 1229, to compel discovery, docs. 1269 & 1270, for leave to appeal in forma pauperis (IFP), doc. 1228, and for assistance of counsel, doc. 1225. The Court **GRANTS** his motions to amend, docs. 1226 & 1233, but **DENIES** his discovery, counsel, and IFP motions, docs. 1225, 1228, 1229, 1269 & 1270. His § 2255 motion should also be **DENIED**.

---

[1] The Court is citing only to the criminal docket and using its docketing software's pagination, which may not always line up with each paper-document's pagination.

# I. BACKGROUND

Alvin,

together with 30 others, [was] charged with conspiracy to possess and distribute cocaine as part of an organization headed by Julius Pinkston.[2] Pinkston initially cooperated with the government, admitting his culpability and that of his co-conspirators in his debriefing. Soon afterward, however, Pinkston fled. All but [Alvin and four others] in this case pleaded guilty.

At trial, the government presented the testimony of 14 co-defendants and several police agents as well as the recordings of intercepted phone calls from three wiretaps. The government alleged that Alvin acted as a courier for the organization and frequently delivered drugs to Bacon, his mother, who stored them at her home. The government also alleged that Roberts, Alvin's girlfriend and later wife, drove Alvin to a drug exchange. Finally, the government alleged that Franklin, Pinkston's girlfriend, and Jamison were involved in the distribution of drugs.

*Bacon*, 598 F.3d at 775 (footnote added). Initially represented by an appointed attorney, Daniel M. King, Jr., he later retained Diane Morrell McLeod. Doc. 427; doc. 1212 at 10; doc. 1215 at 3. Alvin unsuccessfully argued on appeal "that the court plainly erred in sentencing." *Bacon*, 598 F.3d at 775. Both lawyers, he now insists, were ineffective.

---

[2] The indictment charged Alvin with only one count -- conspiracy "to possess with intent to distribute, and to distribute, 50 grams or more of cocaine base (crack) and 5 kilograms or more of cocaine hydrochloride (powder), Schedule II controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2, all done in violation of Title 21, United States Code, Section 846." Doc. 1 at 2.

## II. ANALYSIS

### A. Wiretap Act Claims

Alvin raises fifteen grounds with subparts, many containing laundry lists of alleged acts and omissions by his attorneys, plus government misconduct.[3] In Ground One he insists the Government violated the Wiretap Act (18 U.S.C. §§ 2510-2520) and Fourth Amendment. Doc. 1215 at 1-2 (arguing that the government failed to secure approval from the Attorney General, began wiretapping prior to the judge's authorizing order, and misrepresented facts in its wiretap application).

Ground Two basically rehashes Ground One. There Alvin asserts that "(1) The government made a knowingly and materially false statement in its application for authorization to the wiretap to the Department of Justice ('DOJ'); and (2) The government submitted the application to the district court judge without prior authorization of the DOJ, which would have warranted the suppression of the unlawfully intercepted communication, pursuant to the 4th Amendment and 18

---

[3] He has burdened this Court with repetitive filings (e.g., doc. 1215 largely duplicates doc. 1212-3) and "exhbits" chaotically filed in clusters bearing no rational (e.g., consecutively numbered or lettered) sequences. He also randomly cites to items like "attachment 3D" or "attachment O," doc. 1215 at 9, requiring the Court to paw though piles of papers -- some of them bearing illegible exhibit designations at that.

U.S.C. §§ 2518(10)(a)(i), 2516, and 2515." Doc. 1279 at 5. The Court will reference all of this as Alvin's "Wiretap Claim." For that matter, he has been litigating it non-stop. He raised it *during* sentencing, doc. 780 at 18-19, again in his unsuccessful motion for a new trial, doc. 1141; *see also* doc. 153 (Order denying that motion), and now here. Doc. 1279 at 1-11; *see also* doc. 1283 (motion to compel the government to produce "Wiretap Act" documents).

The government opposes Alvin's Wiretap Claim on the merits and contends that it is procedurally defaulted. Doc. 1258 at 4-9. Under the procedural default rule, "a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." *Lynn v. United States*, 365 F.3d 1225, 1232, 1234 (11th Cir. 2004). This rule "is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. United States*, 538 U.S. 500, 504 (2003); *McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011).

Alvin procedurally defaulted this claim since he failed to advance it on direct appeal. That default can be excused, however, under one of two exceptions: (1) for cause and prejudice, or (2) for a miscarriage of justice, or actual innocence. *McKay*, 657 F.3d at 1196. Alvin can meet the first exception by showing cause for failing to raise the claim, plus actual prejudice from the alleged error. *Id*. Constitutionally ineffective assistance of counsel (IAC)[4] can supply that. *McCleskey v. Zant*, 499 U.S.

---

[4]    On IAC claims the Court applies *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which created a two-part test for determining whether counsel performed ineffectively. First, the movant must demonstrate that his attorney's performance was deficient, which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." 484 U.S. at 687. Second, the defective performance must have prejudiced the defense to such a degree that the results of the trial cannot be trusted. *Id*.

Under the performance prong, the reasonableness of an attorney's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id*. at 690. It is generally appropriate to look to counsel's performance throughout the case in making such a determination. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986). The movant carries a heavy burden, as "reviewing courts must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689. Indeed, Alvin must show that "'no competent counsel would have taken the action that his counsel did take.'" *Ford v. Hall*, 546 F.3d 1326, 1333 (11th Cir. 2008), *quoting Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

For the prejudice prong Alvin must show that there was a reasonable probability that the results would have been different but for counsel's deficient performance. *Kimmelman*, 477 U.S. at 375; *Strickland*, 466 U.S. at 696. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Lightbourne v. Dugger*, 829 F.2d 1012, 1022 (11th Cir. 1987); *Boykins v. Wainwright*, 737 F.2d 1539, 1542 (11th Cir. 1983).

467, 494 (1991).  Under the second exception Alvin must show that he is actually innocent of the crime of conviction.[5]  *McKay*, 657 F.3d at 1199-1200.

Alvin contends that his counsel were ineffective with respect to his Wiretap Act claim.  Doc. 1279 at 3-11.  Even construing his filings liberally, *Smith v. United States*, 420 F. App'x 945 (11th Cir. 2011) ("We construe *pro se* filings liberally to afford review on any legally justifiable base.") (quotes and cite omitted), it is debatable whether he proffers IAC-based cause to excuse procedural default.  Either way -- because he raises standalone IAC claims -- the Court must review his IAC assertions to resolve these issues.

---

[5]  On a non-wiretap issue Alvin raises an actual-innocence claim, discussed *infra*. Doc. 1215 at 23.  As *McKay* explains:

> The actual innocence exception has been applied in two distinct contexts: first, in the face of a claim of actual innocence of the crime of conviction and, second, in the face of a claim of actual innocence of a sentence. *See Sibley v. Culliver*, 377 F.3d 1196, 1205-06 (11th Cir. 2004). To show actual innocence of the crime of conviction, a movant "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt" in light of the new evidence of innocence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see also id*. at 332 (O'Connor, J., concurring).

*McKay*, 657 F.3d at 1196.  "Legal innocence" -- an acquittal based on a legal technicality like a statute of limitations defense -- will not suffice.  *Id*. at 1199-1200; *see also Goodloe v. United States*, 2011 WL 6156843 at * 1 (11th Cir. Dec. 13, 2011) ("[t]he actual innocence exception requires factual innocence, not mere legal innocence, and enhanced sentencing is a matter of legal, not factual, innocence.").

Alvin's lawyers were confronted by case law showing that law enforcement may not use wiretapping as a first resort. *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010); *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986) ("[The] necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed."); *United States v. Quinones*, 417 F. App'x 65, 69 (2nd Cir. 2011).

The Act also requires approval for a wiretap from the U.S. Department of Justice, but "ministerial specificity" is *not* required. *United States v. Small*, 423 F.3d 1164, 1178 (10th Cir. 2005) (wiretap order's failure to identify "the person authorizing the application" as required by the wiretap statute did not prejudice defendants so as to require suppression of wiretap evidence, where wiretap applications were authorized by an appropriate individual within the Department of Justice and that authorizing individual was identified by name in the wiretap application); *see also id.* (the failure to specifically name the Justice Department's authorizing official warrants no suppression of

wiretap evidence because this is a technical defect that did not undermine the purposes of the statute or prejudice a defendant).

From there the government must go to a judge and show probable cause. *United States v. Becton*, 601 F.3d 588, 596-97 (D.C. Cir. 2010); *see also United States v. Hall*, 603 F.Supp.2d 1308, 1312 (D. Colo. 2009) (once a judge authorizes the wiretap, it is presumed proper and the burden is on the defendant to prove its invalidity). That probable cause showing, of course, must be made *before* the judge signs the warrant. *Small*, 423 F.3d at 1177.

Alvin faults his counsel for failing to litigate claimed facial deficiencies in the wiretap order applied in his case. The application for the order, he complains, failed "to identify the person who was duly authorized, and authorized the approval of the wiretap application, in violation of statutory requirement of 18 U.S.C. § 2518(4)(d)." Doc. 1279 at 3. Because this made the order deficient on its face, he concludes, all the poisoned fruit flowing from it would have been excluded, thus altering his trial's outcome. *Id.* at 3-5.

At trial the government introduced evidence derived from three wiretaps, doc. 772 at 62-63, 70-71, and it included intercepted telephone

conversations involving Mistrell "Mice" Alvin (hence, he had standing to challenge *those* wiretapped conversations).[6] *Id.* at 86. On May 30, 2006, Deputy Assistant Attorney General Mary Lee Warren granted DEA agents authority to seek a wiretap order (the federal wiretap) for a telephone number connected to Homer Hollaway. Doc. 1258-1 at 2-4. On June 1, 2006, a judge of this Court signed a wiretap Order for it. Doc. 1258-2 at 2. Under oath (before the grand jury in this case) DEA agent Stephen Tinsley testified that "June the 1st, 2006, is when we activated the wiretap and we began intercepting phone calls . . . ." Doc. 20 at 13.[7]

The wiretap application's supporting paperwork identifies Warren as the authorizing Justice Department officer who approved the warrant

---

[6] The DEA Report attached to Alvin's brief shows no interception of a telephone belonging to him, doc. 1279-1 at 22-23 (report on DEA Administrative subpoena data for a variety of telephone numbers, but *none* belonging to Alvin), and the meat and potatoes of the case against him came from the live testimony of Stephanie Monique Collins. Doc. 773 at 4, 7, 21-26 (Alvin is co-defendant Betty Bacon's son, and he helped Collins break kilos of cocaine down into ounces for distribution; he also acted as a cocaine courier; Collins, on behalf of her father -- Julius Pinkston -- paid Alvin substantial amounts of cash for couriering Pinkston's cocaine). She explained the meaning of tapped calls between her and Alvin. *Id.* at 38, 49-50, 95-96; *see also id.* at 94-95 (the government also adduced a tapped conversation between Alvin and Pinkston). Alvin thus has "Wiretap Act" standing to challenge *those* recordings, but not others. *United States v. Ramos-Gonzalez*, 2010 WL 4181674 at * 3 (D. Puerto Rico Oct. 25, 2010); 2 LAW OF ELECTRONIC SURVEILLANCE § 6:16 (Sep. 2011) ("The definition of aggrieved person in § 2510(11), 'a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed,' is also a definition of standing for purposes of Title III.").

[7] That was not the only wiretap warrant. On June 15, 2006, a state judge signed wiretap Orders (the state wiretaps) for other telephone numbers. Doc. 1258-3 at 2.

application prior to its presentation to the district judge. And there is no showing of any kind that the wiretaps commenced prior to this Court's approval. All of this was explained to Alvin *at sentencing*. Doc. 780 at 15 (Alvin insisted that the judge in this case never signed the wiretap order); *id.* at 18-19 (the prosecutor showed that in fact it *was* signed, but Alvin had simply received an unsigned copy in discovery and thus is consciously ignoring the signed copy, *which is in the record of this case*, in order to bogusly create an issue out of it); *see also* doc. 1258-2 at 10 (copy of this Court's approval of Wiretap Warrant on June 1, 2006).

Undeterred, Alvin continues to claim that the government is lying and thus perpetrating a fraud upon this Court. He insists that the wiretap application "would have listed Mary Lee Warren, instead of Alice Fisher, as the person who duly authorized and approved the wiretap application." Doc. 1279 at 7. What he ignores, of course, is the fact that Fisher's *printed* signature block appears on the application (she was the Assistant Attorney General), while Warren's *signed* name appears beneath it (as *Deputy* Assistant Attorney General). That -- a superior delegating a task to a subordinate -- is a common ministerial act. Alvin

has simply chosen to impugn it (a technicality in any event) in a lame attempt to support this otherwise baseless claim.

The rest of the support on this claim consists of nothing more than Alvin's citation to random bits of information plucked from, *inter alia*, government discovery materials, then mashed-up with similarly outlandish conclusions. For example, to support his conclusion that the government lacked probable cause or otherwise misled this Court when it applied for the wiretap warrant, he says "the DEA Subpoena requesting toll record(s) was not available until June 5, 2006, respectively. . . . The said attachments evince that the [Wiretap Warrant] memorandum is false and/or obtain under false pretense." Doc. 1279 at 5-6. This is typical of Alvin's claims. First, he cites exhibit 1E to his brief. It is a DEA Report of Investigation noting that law enforcement issued an administrative subpoena for four telephone numbers. Doc. 1279-1 at 22. Alvin circled one of them and wrote "not my number invalid number." He also wrote "invalid number" next to a phone number listed for "Holloway."[8] Alvin's brief Exhibit 1F is another DEA

---

[8] Of course, he ignores the fact that this is simply an investigative report bearing phone numbers derived from a pen register. From that information law enforcement then sought to learn from the telephone carrier who used those phones. At trial an agent testified, for example, that one such number belonged to Homer Holloway, but

report noting that on June 5, 2006 a cellphone carrier responded to a May 18, 2006 administrative subpoena "with the requested tolls and the following information[,]" and that incluced three "Holloway" telephone numbers. Doc. 1279-1 at 4.

From all that Alvin contends that "the subscriber information was not made available [to law enforcement] until June 5, 2006[,]" and thus the wiretap application "is false and/or obtain[ed] under false pretense." Doc. 1279 at 6. That is, of course, ridiculous. The government indulged in "open discovery" with Alvin, and that includes law enforcement investigative reports. The fact that some of them reflect *post*-wiretap order information simply does *not* prove that the pre-wiretap order application is "false" or the application's information was obtained under "false pretenses." Alvin simply pretends that any subsequently acquired information "proves" that the application itself was somehow "false" for failing to include it.

Nor, of course, does Alvin's own unsworn assertion that a given phone number was "invalid" prove anything. He simply does not get to re-write reality to support his claims. Suffice it to say that even if law

---

it in fact was used by Stephane Collins. Doc. 772 at 70. That did not make surveillance of that phone "invalid."

enforcement cited what turned out to be non-working phone numbers (criminals routinely change phones to avoid detection), and even if some of the investigative report phone numbers were never mentioned at trial (e.g., they bore no evidential fruit) -- that simply does not prove deceptive conduct rendering the wiretap application fraudulent. Experienced counsel know this, and thus do not waste this Court's time with baseless, fraud-based motions. Ergo, they could not be ineffective for failing to file them.

Alvin therefore has not shown IAC-based cause (nor does he argue actual innocence) to overcome procedural default on his Wiretap Claim. Ground One is thus defaulted and fails. Doc. 1212; doc. 1215 at 1-2; doc. 1279 at 3-8. And "Ground Two Part One," which is a rehash of Ground One but more focused on showing IAC, similarly fails, though Alvin vainly tries to bolster it by contending "that both pretrial counsels [sic] rendered [IAC] for failing to investigate the entire wiretaps documents [sic], which would have also revealed that the affidavit was falsified by the government in order to demonstrate probable cause for its application for wiretaps. . . ." Doc. 1279 at 8; *see also* doc. 1215 at 3.

As noted *supra*, Alvin proffers only his own personal (and outlandish) interpretations of documentation that otherwise demonstrably negates this Ground. And in some places he simply plies unsupported conclusions. He accuses his first lawyer with having "conspired with the government" and insists that "a meaningful investigation would have revealed that count one was defective on its face." Doc. 1215 at 3. Conclusory assertions, of course, go nowhere. *Borden v. Allen*, 646 F.3d 785, 822-23 (11th Cir. 2011) (IAC claim denied because petitioner failed to plead it with adequate specificity).[9] In other places Alvin simply lobs the same time-consuming allegations that he raised and saw squarely rebutted during his prosecution.[10]

---

[9] *See also Caderno v. United States*, 256 F .3d 1213, 1217 (11th Cir. 2001) (citing *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991)); *see also United States v. Laetividal–Gonzalez*, 939 F.2d 1455, 1465 (11th Cir. 1991) (no evidentiary hearing required where movant's allegations fail to satisfy the prejudice prong of the *Strickland* ineffective assistance of counsel test); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (no hearing required on claims "which are based on unsupported generalizations"); *Rodriguez v. United States*, 473 F.2d 1042, 1043 (5th Cir. 1973) (no hearing required where petitioner alleged no facts to establish truth of his claims beyond bare conclusory allegations); *Johnson v. United States*, 2011 WL 3320565 at * 3 (S.D. Ga. Aug. 1, 2011).

[10] For example, he complains that the Wiretap Affidavit referenced a cocaine shipment unrelated to the conspiracy on which Alvin was convicted. Doc. 1279 at 9, 12. What he doesn't acknowledge, however, is that at sentencing the prosecutor *conceded* this point. Doc. 780 at 19-21. He explained to the Court and thus to Alvin, however, that the Confidential Informant assisting law enforcement provided good cause to believe that another conspiracy was tied to the instant conspiracy. And that was noted in the Wiretap, though it later turned out to be untrue. *Id.* Finally, there

## B. Other Claims

In "Ground Two Part Two," Alvin "laundry-lists" an assortment of other IAC claims, this time against Diane McLeod for, *inter alia*, failing to request a continuance to review the grand jury minutes that she had just received (apparently just before trial) from the government,[11] and failing to move to suppress Alvin's threatening statements to law enforcement agents.[12] Doc. 1215 at 4. As explained in *Fortson v. Davis*, 2011 WL 5148662 (S.D. Ga. Oct. 6, 2011), *all* such claims must be factually pleaded, argued, and supported by citation to the record or other competent evidence. *Id.* at * 5. Alvin also must show error that had enough of a substantial and injurious effect or influence in determining the jury's verdict so as to undermine confidence in it. *Id.* at

---

is simply no evidence that the government knew that at the time it generated its application, much less recklessly disregarded countervailing information. And honest errors do not invalidate a warrant otherwise supported by other probable-cause information. *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011); *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986).

[11] The government says it disclosed this to her during *discovery*, doc. 1258 at 12, and Alvin does not refute this.

[12] Further burdening this Court with heft, rather than substance, Alvin rehashes his baseless Wiretap Act claims here. Doc. 1215 at 4 (faulting McLeod for failing to challenge "the fact" that the government commenced wiretapping before the judge signed the authorizing order, and the application lacked Justice Department approval). Again, that claim is meritless.

* 6; *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  Finally, he must thread all that through the above-noted, IAC-criteria (hence show that *no* reasonable attorney would have failed so object, cross-examine, etc.). In that Alvin has failed to do that here, Ground Two Part Two fails.[13]

---

[13]  Some of Alvin's claims are supported by factual pleadings, yet still fail. For example, he complains that agents "terrorized Stephanie Collins and her family," doc. 1215 at 6-7, and thus coerced her into cooperating.  (She was a star witness against him at trial.)  *Id.*  Of course, he has no standing to litigate Collins's rights, so his counsel could not be found ineffective on that score.  And to the extent he contends counsel was ineffective for failing to "uncover" Collins's "scared-into-testifying" circumstances, doc. 1-1, attach. 111, the Court agrees with the government that this is sheer, after-the-fact speculation.  For that matter, on cross examination McLeod got Collins to admit she "was pretty scared" and cooperated with the government only *after* agents found drugs and money in her home.  Doc. 773 at 158, 159.  Alvin does not even suggest what more McLeod could permissibly do.

Another example is Alvin's claim that McLeod should have moved to exclude from the evidence his threatening statements to DEA Task Force Agent Michael Waters. Doc. 1215 at 9.  Unrebutted trial testimony from Waters showed that, following DEA agents' visit to Alvin's home (Alvin was not home at the time, so they left their cell phone number) Alvin himself called Waters.  Waters started to explain the purpose of the visit -- that the agents had incriminating evidence against him, did he want to talk, etc. -- and Alvin got so angry that he hung up and called back multiple times, ultimately threatening to shoot the agents.  Doc. 772 at 147-48; *see also id.* at 148 ("And he even became so mad at one time as to where he threatened us if he come back to his house he was going to shoot us.").

Alvin does not even venture a *guess* as to how any lawyer, let alone his own, would have been able to litigate that statement out of the case.  And it was obviously admissible as demeanor evidence of guilt.  *See also* doc. 780 at 16 (it also was considered at sentencing, where Alvin challenged Waters's credibility by insisting Waters similarly claimed another defendant threatened him).

In that regard, McLeod did not drop dead on this matter.  She proffered an explanation on Alvin's behalf to the jury, doc. 776 at 44, which was a fair strategy call. But the prosecutor stepped over no line when, with that door opened, he fairly commented about it, too.  Doc. 776 at 26.  And, the fact that a DEA report shows another agent (Boyd) noting a threat from Alvin to *Boyd* doc. 1215 at 9; doc. 1258 at

The same must be said for Ground Three, doc. 1215 at 8-12, which also includes his complaint that "Counsel failed to object to the two additional wiretaps from Julius Pinkston's telephone being introduced [into] evidence at trial. . . ."), *id.* at 9, and where he faults counsel for failing to litigate out of this case the aforementioned threat when it was used at sentencing. *See* doc. 780 at 15-17. He simply fails to show *how* any reasonable defense lawyer would have gotten that evidence excluded.

One common thread runs through many of Alvin's remaining claims: his insistence that he *only* conspired to distribute marijuana with Julius Pinkston. Thus, if his lawyers had "only" listened to him and proffered his own CD-ROM of evidence showing this, he would have evaded the cocaine-based judgment and sentence. *See, e.g.*, doc. 1215 at 10-11. This contention, of course, is simply at war with reality. Not only did Stephanie Collins testify that she dealt *directly* with Alvin in distributing *cocaine*, doc. 773 at 4, 7, 21-26, 163-167; doc 775 at 4-24, though marijuana was sometimes in the mix, doc. 775 at 11, 13-14, but,

---

14; *see also* doc. 780 at 16, changes nothing. McLeod obviously risked a *second agent's* (Boyd's) recounting the same threat if she challenged Waters' threat testimony on cross. It was a perfectly reasonable trial stragegy to *not* strike that hornet's nest with the cross-examinational baseball bat. Finally, the Court agrees with the government (doc. 1258 at 24-25) that Alvin could show no prejudice in any event given the overwhelming evidence against him. *See infra* n. 14.

an entire *team* of witnesses followed her to the stand, and they also

testified about Alvin's *cocaine* conspiracy involvement.[14]  Overwhelming

evidence supports his conviction, and reduces to an absurdity IAC claims

that counsel failed to tender the "marijuana-only" evidence (which Alvin

evidently believes would somehow "blot out" the government's cocaine-

---

[14]  Stephanie Collins testified that Alvin was the regular courier for Julius Pinkston, and he brought cocaine to co-defendant Betty Bacon's (Alvin's mother's) house on a weekly basis from January up until June 2006.  Doc. 775 at 21-24.  He brought four kilos a week for four weeks a month, eight kilos in a month, and 30 to 40 kilos over a five or six month period.  *Id.* at 24.  Brandon Collins, Stephanie's son, doc. 775 at 73, saw Alvin twice deliver cocaine to Stephanie at Stephanie's home while Brandon lived with her.  Doc. 775 at 74-75.  Kimbley Pinkston, Stephanie's sister, doc. 773 at 85, witnessed Stephanie give money to Alvin, *id.* at 90-91, and Stephanie related that Alvin had delivered drugs to her.  Doc. 775 at 93.

The government also called Krystal Collins, who is Stephanie's cousin, doc. 775 at 98, and who testified that she went to Betty Bacon's house with Stephanie to meet with Alvin and pick up cocaine from him.  Doc. 775 at 99-100, 101-02.  She later saw Stephanie transfer cash to him to pass on to Julius Pinkston.  *Id.* at 101.  Michael Pinkston, Julius' son and Stephanie's brother, *id.* at 107, testified that he knew Alvin to be a cocaine courier for Julius' organization from December, 2005 until February, 2006.  *Id.* at 112.  He saw Alvin make two cocaine deliveries.  *Id.* at 113, 116.  Charles Willis, who supplied Julius with cocaine, knew Alvin to be a cocaine courier for Julius.  *Id.* at 129-31.  Alvin once brought him a $24,000 payment from Julius for cocaine.  *Id.* at 131. 137.

Next, Homer Holloway, engaged to Stephanie, *id.* at 142, testified that Alvin was a "hauler for Julius Pinkston."  *Id.* at 144; *see also id.* ("we called him a mule.").  He watched Alvin deliver two kilos of cocaine for Pinkston.  *Id.* at 145.  Harry Alvin, Mistrell's *own father*, *id.* at 163, testified that his son trafficked cocaine for Pinkston, at $500 a load, at least four or five times, "from Atlanta to Metter."  *Id.* at 164.  Bob Aaron Mikell was a "money collector" for Pinkston's organization.  *Id.* at 172.  He testified that, while picking up some drugs from Stephanie Collins at her home, she told him that Alvin was bringing a load of it to her from Atlanta.  *Id.* at 173-74.  On another occasion he sought to buy some marijuana.  Both Stephanie Collins and Julius Pinkston told him to wait for Alvin "to bring the load down."  *Id.* at 174.

conspiracy evidence) to which Alvin now constantly adverts.  Doc. 1215 at 10-11.  Hence, all of Alvin's "marijuana-only" based claims fail.

Alvin similarly assaults reality with his related IAC claims.  Just one example, from a torrent of IAC allegations found in the middle of "Ground Three," demonstrates this point: "Stephanie Collins testified that Petitioner trafficked drugs under his battery compartment [cites]; Counsel failed to object and present evidence which would have revealed that drugs could not have fit under the baby seat or inside the battery compartment, which would have discredited [her] testimony."  Doc. 1215 at 10; *see also id.* at 13 (he blends this claim into another IAC claim).

Of course, Collins never mentioned a baby seat when she testified about the "battery compartment" meeting.  Instead, she said that Alvin retrieved from under his SUV's battery two kilos of cocaine, *then also* retrieved two pounds of marijuana from the third row of seats inside his SUV.  Doc. 775 at 10-11.  During another meeting, arranged so she could pay Alvin for drugs he'd delivered, Collins met him with his wife, Jessica Roberts, beside a road.  Alvin again was in his SUV, and this time he had his baby in the back seat.  "And he started to pull drugs from around the baby's car seat.  And then he reached behind that seat, like the third

seat. And that's when he come back with more drugs. And all of it was wrapped in the black electric tape." Doc. 773 at 99-100. The prosecutor would later comment on this during closing argument: "They pull up in the middle of nowhere, you know, in this deserted spot on the road where there is nobody around to see them. And [Collins] walks over [to] the black SUV. Jessica is driving the vehicle. She drove them down. Mistrell is in the backseat. The deal is done right there in the car. He's unloading the dope from behind the baby seat where it is packed right around the baby." Doc. 776 at 31-32.

Alvin does not even begin to explain how or why two pounds of wrapped contraband could not be secured around a baby or SUV seat, much less how no reasonable lawyer would have failed raise such a defense. He cites photos he claims he emailed to McLeod the day before trial, proving "that cocaine could not have fit under either of them, which would have discredited Stepanie Collins' testimony." Doc. 1215 at 10. What he does not do, however, is furnish any evidence showing how cocaine or marijuana cannot be shaped into seat-centric packaging, which by definition is what Collins described, and which went unrebutted at trial. The same must be said for negating common

knowledge of an SUV's capaciousness and the putative mass/shapability of a kilo of cocaine and a pound of marijuana. And it is, of course, common knowledge that drugs are routinely transported in all sorts of shapes, sizes, and camouflage. Hence, Alvin's complaint that McLeod "abandoned" that defense goes nowhere, for it cannot be said that no reasonable attorney would have done otherwise.

The Court similarly denies the dense cluster of "sub-claims" that Alvin has inserted into Ground Three. For example, he faults counsel for failing to object to a perceived discrepancy between an FBI report ("FBI 302 interview") relating how drugs were brought to his mother's home and seized on June 25, 2006. Doc. 1215 at 10. He raised this same claim during sentencing. Doc. 780 at 14-15. It rests on the fantasy that government agents *always* get the facts "right" when recording what they learn during an investigation, so therefore any variance *at trial* simply "must be" a fraud perpetrated upon the Court, or something supporting an IAC claim if counsel fails to make an issue out of it.

The simple truth is that time erodes all human memory, people lie to or mislead agents during an investigation, and agents simply err in recording "facts" as they investigate a case (which is one reason why

prosecutors don't like to hand over "302's" during discovery). But that does not mean that ongoing field reports (FBI agents routinely record their investigative findings in "302's"), if erroneous, are something to which defense counsel should object, as such reports are *not* admitted as evidence at trial but in fact are mere documents passed along under the commandable open-file discovery policy generally followed by the government in this District.

In Ground Four, Alvin complains that McLeod also fell below the *Strickland* standard by failing to call him to the witness stand on his own behalf. Doc. 1215 at 13. At the conclusion of the government's case the judge warned the defendants:

> Each of you, Mr. Mistrell Alvin, Sheikel Jamison, Betty Bacon, Andrea Franklin, and Jessica Roberts, I am sure counsel have advised you, but I feel compelled to advise you again. You may make the personal decision whether or not to testify. Repeating it, no one can compel you to testify. But no one, including the judge, the prosecutor, or your lawyer can prevent you from testifying.

Doc. 775 at 199. After that, he asked: "Ms. McLeod, have you made that known to your client? MS. McLEOD: I have, Your Honor. *Id.* at 200. Alvin was present when she said that and did *not* speak up. He asserts, however, that he desired to exercise his right to testify.

All criminal defendants possess the fundamental right to testify in their own defense, and that right to chose is personal. *United States v. Hung Thien Ly*, 646 F.3d 1307, 1313 (11th Cir. 2011). But "the district court does not normally engage in a colloquy with the defendant to ensure that the decision was made knowingly and intelligently." *Id.* "Rather, a defendant represented at trial may vindicate his right to make a knowing and intelligent decision whether to testify through a claim of ineffective assistance of counsel." *Id.* at 1314. Hence, it was McLeod's obligation to provide the advice needed to render Alvin's "decision of whether to testify knowing and intelligent." *Id.*

Sometimes an evidentiary hearing is required on this sort of claim, *see, e.g., Gay v. Sec'y, Dep't of Corrs.*, 2011 WL 4031172 at * 12 (N.D. Fla. Aug. 23, 2011), but not this one, since Alvin also must, but cannot, show prejudice.[15] As in *Franklin*, 227 F. App'x at 860, the conspiracy evidence against Alvin was overwhelming and, frankly, the things he now claims he would have adduced through his own testimony are either outlandish

---

[15]   *Franklin v. United States*, 227 F. App'x 856, 860 (11th Cir. 2007) (defendant was not entitled to an evidentiary hearing on his § 2255 motion in a drug-trafficking case, in which he asserted IAC on account of his lawyer's purported failure to inform him of his right to testify at trial; the evidence of his guilt was so overwhelming that, even if he had testified at trial, the outcome would not have been different, so he could show no *Strickland* prejudice).

(e.g., that he could, despite the avalanche of wiretap and testimonial evidence against him, "prove" he dealt only in marijuana, not cocaine) or simply would have hurt him (e.g., his baby seat and battery compartment photographs -- obviously tendered under the delusion that such drugs cannot be shape-packaged).

In Ground Five Alvin complains that counsel should have but failed to move for a judgment of acquittal, and also for a new trial. Doc. 1215 at 14. Here he simply repeats many of the groundless claims raised above, assumes they have merit (they do not), and thus concludes that counsel provided IAC by failing to invoke the acquittal/new-trial remedies. This claim, too, is just plain frivolous.

Ground Six fails outright because it simply recycles Alvin's Wiretap Act Claim and rests on his bare assertion that the government "knew" its Wiretap was unlawful and thus all evidence derived from it was "unlawful." Doc. 1215 at 15. The Wiretap was not unlawful, and the evidence was admissible. Alvin also insists that the "drug amount [admitted against him and on which his sentencing in no small part rested] was manufactured to give [him] a harsher sentence if convicted." *Id.* He then lists the people he feels should have been indicted, and he

excludes himself from that list. *Id.* At bottom, this is just a derivation of his sentencing-phase objection that any amount over five kilograms of cocaine should have been determined by a jury. Doc. 780 at 8. As the Court then explained, the jury expressly found "that the conspiracy involved 50 grams or more of cocaine base or five kilograms or more of cocaine hydrochloride." *Id.* at 11. Ample evidence supports this finding, *see supra* n. 14, and Alvin simply proffers his own take on it here, then childishly insists that *it* should prevail.

In Ground Seven Alvin accuses the government of committing a *Brady* violation, *see Brady v. Maryland*, 373 U.S 83 (1963).[16] Doc. 1215 at 17. Here he indulges in his own conclusion-laden spin on a mass of information without showing the government's failure to timely disclose to him *Brady*-based information.[17] And once again, he rehashes his Wiretap claim here. *See, e.g., id.* at 17 ("[T]he government suppressed

---

[16] "[T]he suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment." *Hammond v. Hall*, 586 F.3d 1289, 1305 (11th Cir. 2009). "A *Brady* violation has three components: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Id.* (quotes and cite omitted).

[17] The government disclosed its electronic surveillance information during discovery, doc. 337 at 5, and Alvin cites *no* material information that should have but was not disclosed. Instead, he cites information from the government, then places his own spin on it while insisting the Wiretap affidavit was fraudulent, etc. Doc. 1215 at 17.

the fact that [it] never did receive authorization from the Attorney General or his designees."). This claim, too, is baseless.

Alvin's next claim (Ground Eight) is also meritless. Doc. 1215 at 19. He once again rehashes his Wiretap Act claim, this time insisting that the government lacked probable cause to seek its wiretaps. As explained while examining Ground One, this claim -- partially rehased here -- is procedurally defaulted. Even if not, the Court agrees with the government that, of the 83-pages of affidavit that support the warrant, docs. 1258-6 & 1258-7, there may be some minor factual discrepancies, but nowhere near what is needed to support the showing Alvin must make here: a substantial showing of a false statement made knowingly and intentionally, or with reckless disregard for the truth, on a matter that was necessary to the probable cause finding. *Poulsen*, 655 F.3d at, 504; *Van Horn*, 789 F.2d at 1500. Alvin shows neither, and his self-serving interpretation of the evidence will not suffice.[18]

---

[18] As an example, the affidavit recounts an extensive investigation involving dozens of people involving a variety of telephone numbers. One section of it relates that "[b]etween March 1, 2006 and May 7, 2006, the PREVIOUS TARGET TELEPHONE NUMBER was in contact with telephone number 912-682-4662 (5) five times. The last call occurred on March 19, 2006. CS#1 knows this to be the cellular telephone of SMITH and has made numerous recorded telephone calls to this number during the negotiations of cocaine base during the past month." Doc. 1258-7 at 12.

In Ground Nine Alvin recycles his "drugs-from-another-conspiracy" argument in accusing his counsel of ineffective assistance in failing to "argue for a lessor [sic] charge." Doc. 1215 at 21; *see also* doc. 780 at 22 (sentencing judge, after hearing Alvin on this "other conspiracy" assertion and the government's response, finding: "The Court is satisfied that the defendant is not being charged with any weight amount or conduct for some case for which he is not responsible,

---

Alvin insists "[t]he telephone 912-682-4662, which dissipated the probable cause and the calling pattern[,] was fabricated to mislead the judge that there was probable cause to wiretap the target telephone." Doc. 1215 at 19. This is the sort of assertion on which Alvin routinely relies -- he does not cite any support to show that it was "fabricated," much less how it misled the Court or "dissipated" probable cause. In a follow-up brief he notes the number belonged to Ceceila Smith, "not Stephanie Collins," so "the calling patterns could not have been the same [cite], and compare to Agent Tinsley[']s sworn testimony." Doc. 1279 at 9. He then supplies a portion of the trial transcript where Tinsley testifies that, after Tinsley had acquired a court-ordered pin register on it, he discovered that Stephanie Collins (not Ceceila Smith) was using it. Doc. 1279-1 at 1; *see also* doc. 772 at 69-70.

Alvin thus has cited the bread and butter of a typical drug-case investigation: a phone thought to belong to one individual turned out to be owned or used by another. A natural discrepancy is detected and noted, yet Alvin chooses to label it "fraudulent" and from there concocts a § 2255 claim.

This approach -- citing to record fragments, declaring something false or fraudulent, then leaping to a case-dispositive conclusion -- runs throughout Alvin's copious filings, betraying his evident belief that "rope-a-dope" briefing, rather than convincing evidence, can win him § 2255 relief. To risk belaboring the obvious: It is *not* fraudulent to say that a phone belonging to one individual was used by another. Indeed, on the very next page of that same transcript is this from agent Tinsley: "The (912) 541-2893 [number] was subscribed to by Ms. Stephanie Collins. However, it was primarily used by Mr. Julius Pinkston, her father." Doc. 772 at 71; *see also* 775 at 99 (similar instance where a phone was set up in one conspirator's name but in fact used by another).

that it is all within the jury verdict"); *see also supra* n. 9. Alvin also faults counsel for failing to move to dismiss "count one as defective on its face," doc. 1215 at 21, and that, too, is meritless (he makes not even the faintest showing, for example, that the alleged facts do not establish a violation of criminal law). The same must be said for his laundry-list of other IAC omissions, such as counsel's failure to present evidence showing he only dealt with marijuana. *Id.*

Ground Ten presents Alvin's "actual innocence" claim, doc. 1215 at 23, and it, too, rests on his "marijuana-only" assertion, which is negated by the overwhelming evidence detailed above, and thus comes nowhere close to meeting the actual-innocence standard set forth in footnote 5. Similarly frivolous is Ground Eleven's "Prosecutorial Misconduct" claim, doc. 1215 at 24-30, which primarily consists of Alvin's outrageous spin on trial and sentencing evidence, followed by application of his own private evidence code to deem incriminatory evidence "inadmissible." Example: "(5) the government informed the jury with the impression Petitioner and everyone on trial was guilty also, informing the jury that non testifying [sic] codefendants plead guilty was inadmissible evidence." Doc. 1215 at 24. Another example: "(12) The government presented the

jury with a booklet of the wire tap synopsis [and this] was inadmissible and prohibited as evidence from the unlawful wiretaps." *Id.* at 25. Unsurprisingly, Alvin supplies no legal citation for why the wiretap transcriptions were "inadmissible." He simply makes up his own law on the subject,[19] then declares incriminating evidence "inadmissible," then demands § 2255 relief based on that. Suffice it to say that this Ground fails. Ground Eleven's remaining (and equally frivolous) "sub-claims" are all at best baseless, too.

Ground Twelve is yet another "Prosecutorial Misconduct" charge, this time based on an incident that occurred at sentencing. Once again, however, Alvin ignores the overwhelming evidence against him, most notably on the "five-kilogram" evidence supporting his sentence. Doc. 1215 at 28-30. Here he also rehashes many of his earlier claims, including the "illegal" wiretap, and the lack of "cocaine" evidence against him (again, Stephanie Collins' testimony *alone* supports that drug quantity, doc. 775 at 21-24; *see also supra* n. 14), all capped off with his own self-serving conclusions (e.g., "The AUSA solicited false testimony

---

[19] "Transcripts may be used as substantive evidence to aid the jury in determining the real issue presented, the content and meaning of the tape recording." *United States v. Montor-Torres*, 2011 WL 6308493 at * 1 (11th Cir. Dec. 19, 2011) (quotes, alteration and cite omitted); *United States v. Neighbors*, 590 F.3d 485, 495 (7th Cir. 2009).

from codendants that the meetings were about a delivery of cocaine, which the government had in its possession the evidence that the evidence would have revealed [that Alvin] wasn't involved with cocaine."). This Ground, too, fails.

Ground Thirteen is no different. Here Alvin says he "advised appellant counsel that the drugs in count one was [sic] manufactured and that the AUSA admitted to it on the record at sentencing." Doc. 1215 at 31-32. He then accuses counsel of being ineffective for failing to argue this on appeal. *Id.* Again, the prosecutor *admitted* at sentencing that the government's informant, and thus the DEA agents, initially (and reasonably) believed another group's drug activity was linked to Pinckston's, then later realized that this was not the case. Hence, the government never introduced into this case any such evidence from that case. Alvin simply pretends that it did, then labels that non-fact as "evidence" of "manufactured" evidence in this case. He then caps all of this off by insisting that he "only" dealt in marijuana. For good measure, he recycles his "Wiretap" claim, all before demanding an IAC finding -- because his lawyer failed to push this bundle of frivolous

arguments up the appellate hill. *Id.* Alvin's § 2255 motion thus should be denied on these grounds, too.

Ground Fourteen also fails. Here Alvin complains that his appellate counsel failed to argue that his drug amount must be determined by the jury. Doc. 1215 at 33. As noted above, it was. Doc. 780 at 11 (jury's findings of "50 grams *or more* of cocaine base or five kilograms *or more* of cocaine hydrochloride"). Counsel also was ineffective, he insists, because at sentencing the Probation Officer "came up with the drug amount of 15 to 50 kilograms which gave [Alvin] a guideline range of" 151-188 months. *Id.*

In fact, Stephanie Collins' testimony alone supported the "15 to 50 kilogram" range. Doc. 775 at 21-24 (Alvin brought four kilos a week for four weeks a month, eight kilos in a month, and *30 to 40 kilos* over a five or six month period; 30-40 is within the 15-50 kilogram range). It was the sentencing judge's task to measure Alvin's role against the relevant conduct for which he was to be held accountable. *United States v. Rodriguez De Varon*, 175 F.3d 930, 940–41 (11th Cir. 1999). Alvin never does say what appellate counsel should have argued here.

Finally, in Ground Fifteen Alvin contends that the Court abused its discretion in ordering him to participate in a Financial Responsibility Program. Doc. 1215 at 34. In fact, it did not order such participation. Doc. 720; doc. 780 at 31-34.

## III. CONCLUSION

The Court **GRANTS** Mistrell Alvin's motions to amend, docs. 1226 & 1233, but **DENIES** his discovery, appointment-of-counsel, and IFP motions because he fails to meet the standards set forth in *Wellons v. Hall*, 554 F.3d 923, 935 (11th Cir. 2009) (discovery); *United States v. Aviles*, 380 F.App'x 830, 830 (11th Cir. 2010) (appointment of counsel), and 28 U.S.C. § 1915(a) (the appeal for which he seeks IFP is moot). Docs. 1225, 1228, 1229, 1269 & 1270. The Court **GRANTS** his motion to extend time, CV611-065 doc. 3, but **DENIES** his motion for a subpoena. *Id.* doc. 4. His 28 U.S.C. § 2255 motion, CR606-026, docs. 1212 & 1214, should also be **DENIED**.

Case number CV611-067 is an errant, partial duplication of this case, CR606-026, (its civil analogue is CV611-065). The Court therefore **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** CV611-067.

Applying the Certificate of Appealability (COA) standards set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb. 9, 2009) (unpublished), the Court discerns no COA-worthy issues at this stage of the litigation, so no COA should issue. 28 U.S.C. § 2253(c)(1); *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (approving sua sponte denial of COA before movant filed a notice of appeal). And, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, in forma pauperis status on appeal should likewise be **DENIED**. 28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED** this  10th  day of January, 2012.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA